**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ROBERT AARON WEILBACHER, :
UNIT #15141
APO AP 96224
Camp Hovey, Korea                          :

             Petitioner,       :

       v.                       :       **No.** _____

JOHN M. McHUGH,                            :
Secretary of the Army,
101 Army Pentagon                          :
Washington, DC 20310
                        :
            Respondent.

**PETITION FOR A WRIT OF HABEAS CORPUS AND OTHER RELIEF**
**BY A PERSON IN MILITARY CUSTODY**

    Robert Aaron Weilbacher petitions this Court for a Writ of Habeas Corpus and other

relief on the grounds that his application for discharge as a Conscientious Objector has been

wrongfully denied.   In support of his Petition, he states:

**PRELIMINARY STATEMENT**

    1.      Petitioner is a Specialist in the United States Army, on active duty, most recently

deployed in Korea as a Healthcare Specialist (Medic).

    2.      Before and at the time of his enlistment, and for a time afterwards, Petitioner was

a staunch supporter of going to war to defend our country.  But his views changed as a result of

conversations with fellow medics, who had been combat-deployed, about their experiences.  He

learned about children being blown up as collateral damage in war. While these medics accepted

that innocents would accidently be killed as part of war, Petitioner did not accept this as justified;

it led him to a course of research, study, reading, reflection, and meditation, as a result of which

he concluded that his moral and ethical beliefs would not allow him to continue military service.

Instead, Petitioner realized that he was a conscientious objector ("CO"), opposed to participation

in war in any form.

3.      Petitioner submitted an application for discharge as a conscientious objector in

accordance with Army procedures.  His claim was ruled sincere and valid by the chaplain and by

the officer appointed by the Army to investigate his application.  This investigation included an

evidentiary hearing at which Petitioner and others testified.  Petitioner's CO claim was

eventually granted in a Determination issued by the Department of the Army Conscientious

Objector Review Board ("DACORB"), which entitled him to an honorable discharge as a CO.

4.      Under Army regulations, the decision of the DACORB was final.  Nevertheless,

in violation of the applicable regulation, a Deputy Assistant Secretary of the Army

countermanded the DACORB determination.

5.      Because the Deputy Assistant Secretary's action was unlawful, and because on

the merits a denial of Petitioner's application would lack any legally sufficient basis in fact,

Petitioner should be granted relief, restoring the DACORB's determination that he is a

Conscientious Objector, and releasing him from the Respondent's custody with an honorable

discharge.

**PARTIES, JURISDICTION AND VENUE**

6.      Petitioner Robert Aaron Weilbacher is a Specialist in the United States Army.  He

is a United States citizen.  His is assigned to the Second Infantry Division, First Armored

Brigade Combat Team, HHT, 4th Squadron, 7th Cavalry, which is currently stationed at Camp

Hovey, Korea.   Petitioner is currently on leave, and is scheduled for reassignment to Fort

Campbell, Kentucky, beginning on May 6, 2015.

7.      Respondent John M. McHugh is the Secretary of the Army.  He is the official of

the United States government charged with the control and administration of all Army personnel

and affairs wherever situated or assigned.  He is sued in his official capacity.

8.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 2241 (Habeas Corpus), 1361

(Mandamus) and 1331 (Federal Question).  This court has authority to issue a writ of habeas

corpus and to grant relief as law and justice require under 28 U.S.C. § 2241(a) and (c)(1) because

as an enlisted member of the United States Army, the Petitioner is "in custody under or by color

of the authority of the United States." The Respondent is present within the jurisdiction of this

Court, has the ability to produce the Petitioner's body before this Court, and the authority to

grant Petitioner's release from the Army as a Conscientious Objector.

## FACTS

**The development of Petitioner's conscientious objection to participation in all war**

9.      Petitioner did not begin his military service as a conscientious objector; in fact,

his views were strongly in favor of military service.  In college, Petitioner first attended a

Mennonite university; in contrast to the traditional Mennonite pacifist beliefs held by most of his

classmates, he testified that he was very conservative and supported an aggressive foreign policy,

and often spoke out in favor of war in his political science classes.  Petitioner was one of "the

biggest staunch supporters of going to war to defend our country."  12/16/14 DACORB

Determination (attached as Exhibit B).

10.     Indeed, Petitioner was focused on aggressive combat service. After completing

his college education at The Ohio State University in June 2011, he attended Marine Officer

Candidate School for several weeks in January and February 2012, but sustained an injury during training and could not graduate.

11.     In April 2013, Petitioner entered the Army.  He signed a contract that included Airborne and Ranger School, and attended Basic Combat Training.  Again, he sustained an injury and was unable to complete Airborne school, but, at that time, he expected to return to it after his assignment in Korea.

12.     Petitioner excelled in Basic Combat Training (BCT) and medic training. Petitioner completed his training and was assigned to South Korea, arriving there on December 11, 2013.  It was his first duty station.

13.     On or about January 1, 2013, Petitioner applied for the "Green to Gold" program, an officer candidate program, on the recommendation of his then Company Commander, and his leaders within the medical platoon, because of the excellence of his military performance.

14.     On January 24, 2014, at his duty station in South Korea, Petitioner spoke with some previously combat-deployed medics about their deployment, including his Platoon Sergeant and another Sergeant.  They discussed having to shoot their weapons downrange at the enemy, and their experience seeing children being blown up as "collateral damage" of war. Medics (except for those recognized as noncombatant COs) carry weapons and are typically expected to use their weapons if their patients are threatened.

15.     This conversation caused Petitioner to begin to have significant doubts about his own beliefs about participation in war; he began an intense process of reading, study, reflection, and meditation.

16.      Petitioner's readings and study included, but was not limited to, *Pilgrimage to Nonviolence* by Martin Luther King, Jr.; Gandhi's *Speech of Non-Violence*; *The Trials of*

*Muhammad Ali*; The Dalai Lama's message on *The Reality of War;* and material from the website *Iraq Body Count*.

17.     Petitioner's reading, reflection, study, and meditation on these texts and materials, and his conversations with other soldiers about their deployment experiences, caused him to experience a profound change in his deepest moral and ethical views about participation in war.

18.     As Petitioner wrote in his CO application:

> …[T]he accumulation of discussion, research, reading, meditation and media observation about war and the impact of war changed the way I seek to lead my life. As I thought about the possibility of my own participation in war, I knew that my new moral and ethical beliefs would not allow me to continue serving in the military. I realized that military service is inseparable from supporting war and the killing of people.

19.     Regarding his new understanding of the military's inculcation of a culture of killing, Petitioner wrote:

> What I once believed to be a just cause, I came to the strong realization that war is always unjust and immoral. … In order for me to live a life focused around my moral and ethical code, I cannot participate in this degradation of human life that happens in the military with war.

20.     Petitioner's beliefs with regard to participation in all wars became firm and fixed on or about February 3, 2014, as a result of the accumulation of the intensive and focused reading, reflection, study and meditation undertaken by Petitioner following his January 24, 2014 conversations with recently deployed medics. As he explained in his CO application, Petitioner "thought about the possibility of [his] own participation in war, [he] knew that [his] new moral and ethical beliefs would not allow [him] to continue serving in the military. [He] realized that military service is inseparable from supporting war and the killing of people."

21.     Petitioner's moral and ethical beliefs were incompatible with service as a military medic, because, as he explained in his testimony to the Investigating Officer, "even as a noncombatant medic, his work "furthers the conduct of war;" and, as he explained in his 9/14/14 Rebuttal, "perpetuates the cycle of war" by returning combatants to combat.

22.     Petitioner's conversations with the Medics who had deployed, and his personal awareness, through their experiences, made him understand for the first time the reality of collateral death and destruction caused by war. His previous military experience and training had stressed only the positive and glorified aspects of military service.

**Petitioner declares himself a conscientious objector and submits his application.**

23.     On February 5, 2014, Petitioner informed his Platoon Sergeant that he was a conscientious objector because of his sincere moral and ethical opposition to participation in all wars. Exhibit B, DACORB Report at 4.

24.     Petitioner's Platoon Sergeant immediately informed the First Sergeant and the Sergeant Major, and then directed Petitioner to meet with the Unit Chaplain; Petitioner did so, and the Unit Chaplain, after a lengthy conversation with Petitioner, began to prepare and in fact printed out a memorandum supporting the sincerity of Petitioner's CO beliefs. However, Petitioner's command told the Unit Chaplain that because he was Petitioner's Unit Chaplain, he could not complete or submit the memorandum. Petitioner understood from this that the Unit Chaplain's favorable memorandum could not be available to him in any form, even though the applicable regulation would have permitted such a memorandum to be submitted in support of Petitioner's CO application.

25.    On February 7, 2014, Petitioner's First Sergeant summoned him to his office to discuss Petitioner's beliefs and CO application.  Petitioner read the First Sergeant the entirety of his CO application.

26.    On February 11, 2014, Petitioner submitted his CO application to the First Sergeant.  Petitioner sought discharge as a "1-0 conscientious objector" (opposition to all participation in the military).  He did not seek "1-A-0 noncombatant" conscientious objector status.

27.    Also on February 11, 2014, Petitioner learned by email that he was declined for the Green to Gold program. He was encouraged to re-apply.  Because he had become a Conscientious Objector, however, Petitioner did not re-apply.

28.    Petitioner's CO application included supporting statements from a number of witnesses, both military and civilian, who described changes in Petitioner's behavior, character, and demeanor in the period December 2014 – February 2015; the seriousness, depth and genuineness of Petitioner's commitment to his views in opposition to participation in war; and respect for his honesty and morality.

29.    While Petitioner submitted his CO application promptly upon realizing that his beliefs prevented him from participating in war in any form, Respondent delayed in processing his CO application. The applicable regulation sets forth the expectation that CO applications will be processed and submitted to DACORB within 90 days. Respondent did not submit Petitioner's application to DACORB for more than 200 days.  Indeed, more than 90 days (106 days) had elapsed before an Investigating Officer was even appointed.

**The Battalion Chaplain confirms the depth and sincerity of Petitioner's CO beliefs.**

30.     After interviewing Petitioner over a period of three days, a  Battalion Chaplain (from another unit) confirmed the depth and sincerity of Petitioner's CO beliefs.

31.     In a memorandum dated March 26, 2014, the Battalion Chaplain concluded that Petitioner, an atheist, had beliefs that were "foundational" and "central" to him; that he had come to these beliefs through "exploration and self-study of significant texts"; that Petitioner was "sincere in his convictions," which he found were "deeply held"; and that Petitioner "demonstrated consistency in their application to his daily rituals and life activities."

32.     While characterizing Petitioner's views as "young" in that they developed over a short period of time, the Battalion Chaplain noted a number of examples of how Petitioner's "lifestyle choices and behavior appear to be consistent with his beliefs."  The Chaplain noted, for example, Petitioner's continued research and study; Petitioner's replacement of violent games with nonviolent activity; and Petitioner's steadfastness of belief notwithstanding social scorn.

**The Army's investigatory hearing confirms that Petitioner
is a sincere conscientious objector to war in any form.**

33.     On June 10, 2014, the Investigating Officer appointed to investigate Petitioner's CO Application conducted Petitioner's conscientious objector hearing.

34.     Petitioner testified under oath at this hearing and was questioned extensively by the Investigating Officer.   Other witnesses also testified under oath and were questioned by the Investigating Officer.

35.     By memorandum dated June 16, 2014, the Investigating Officer issued his "Findings and Recommendations of Conscientious Objector Investigation" for Petitioner. (Exhibit A)

36.     The Investigating Officer set forth in detail the basis for Petitioner's CO beliefs; the chronology of the development of Petitioner's CO beliefs; and, based on the applicable regulatory standards, how Petitioner's beliefs and the evidence met the criteria for recognition as a conscientious objector.

37.     The Investigating Officer summarized Petitioner's CO beliefs: Petitioner was a pacifist atheist, believing not in the principle of religious redemption but only in his own will to do what is morally and ethically right according to his conscience.  Consequently, Petitioner "believes that the value of his own life is measured only by his ability to act within the bounds of his own moral and ethical beliefs and ultimately his ability to live a peaceful and nonviolent life."  Petitioner "firmly believes that all human life … should be treated with the utmost respect … [and] holds very dearly the value of all human life and deplores the loss of life, both combatant and noncombatant, caused by war."  Petitioner "believes that the impacts and effects of participation in war are inherently evil, and that his direct or indirect involvement in the conduct or support of war, violates his moral and ethical belief that nonviolence and cooperation are the only rational means by which to manage disagreement at any level."  Petitioner "believes that there is no justification for war, and supports this belief against all wars, past, present, and future."

38.     The Investigating Officer set forth the chronology of the development of Petitioner's CO beliefs, finding that when Petitioner first encountered pacifism in 2007 as a student attending a Mennonite university, he supported the use of force and an aggressive foreign policy, and that he continued to hold these beliefs when he finished his degree, when he was a Marine Corps officer candidate, and when he was an Army enlistee, through January 24, 2014. The Investigating Officer specifically found:  "During this time, [Petitioner] continues to hold his

beliefs that war is a necessary tool with which nations, specifically, the USA, may achieve national goals, and thus help people."  Exhibit A at 3.

39.     The Investigating Officer explained the crystallization of Petitioner's CO beliefs: on January 24, 2014, Petitioner had conversations with "leaders and peers about their experiences in Iraq and Afghanistan and [heard] about noncombatant casualties."  These conversations became "the starting point for [Petitioner's] research into casualty statistics" and the teachings of nonviolence leaders.  Exhibit A at 3.  Indeed, Petitioner's Staff Sergeant's hearing testimony confirmed that a conversation with him "may have been the impetus for [Petitioner's] research of warfare, human suffering, and collateral damage and finally researching nonviolence."   Investigating Officer's 6/10/14 Summary of Staff Sergeant's Testimony.

40.     The Investigating Officer found that on February 3, 2014, Petitioner reached a decision that he believed that all war was immoral, and that he had to apply for discharge as a conscientious objector.  The Investigating Officer also found that Petitioner thereafter continued to develop his beliefs through research and self-study of nonviolence leaders.

41.     The Investigating Officer found that Petitioner's beliefs constitute Conscientious Objection, as defined in the applicable Army Regulation, because his beliefs were not present at the time of his enlistment, but were based on beliefs developed and solidified since his enlistment, that Petitioner's beliefs were not based solely on policy, pragmatism, or expediency, but rather on Petitioner's belief that all war is unjust; that Petitioner was opposed to all wars, past, present, and future; and that Petitioner's beliefs were sincere.

42.     In finding that Petitioner's beliefs were sincerely held, the Investigating Officer credited the testimony of five witnesses, who testified under oath that Petitioner was sincere in

professing his CO beliefs.  In particular, the Investigating Officer credited the testimony of two witnesses who had spent considerable time with Petitioner, discussed their interactions with him, and gave examples to support their testimony.

43.     The Investigating Officer also credited Petitioner's "general demeanor and intellect," his "continue[d] … time in self study and meditation," and his showing of "legitimate conviction when discussing his beliefs."  Exhibit A at 4.  The Investigating Officer also credited Petitioner's actions; Petitioner's outreach to feed homeless Koreans in need was, for the Investigating Officer, illustrative of Petitioner's "belief in the need to help others as well as the value that he places on human life." *Id*.

44.     The Investigating Officer did not credit the testimony of the two witnesses who disputed Petitioner's sincerity.  These witnesses disputed Petitioner's sincerity "based on the proximity of [Petitioner's CO application] and his denied OCS packet, regardless of the actually [sic] chronology of these two events."  These witnesses further testified that Petitioner was "an honest individual and gave no reason to question his integrity."  The Investigating Officer noted this as "a contradiction of information" in these witnesses' testimony, which "ultimately weakened the credibility of their arguments."  Exhibit A at 4.

45.     In other words, even though Petitioner had concluded that he was a CO, and had informed his Platoon Sergeant and his First Sergeant of that fact, and had written and prepared to file a formal CO application, *before* he knew that he had been declined for the Green to Gold program, these two witnesses persisted in believing that he applied for CO status only because he was declined for the Green to Gold program.  The Investigating Officer properly did not credit this testimony, as it was in conflict with the "actual[] chronology."  Exhibit A at 4.

46.     In finding Petitioner sincere, the Investigating Officer also found support in Petitioner's dedication to self-study, research, meditation, and discussion of the ideals of nonviolence.  Exhibit A at 4.

47.     In finding Petitioner sincere, the Investigating Officer also found support in Petitioner's "positive pattern of conduct," as testified to by all who testified in the hearing, with "no negative points."  Exhibit A at 5.

48.     In finding Petitioner sincere, the Investigating Officer also found support in the credibility of the individuals supporting Petitioner's CO application: his fellow soldiers and first-line leaders, who knew him best.  The Investigating Officer observed that because these individuals "have nothing to gain from supporting [Petitioner's] application, it is unlikely that they would be dishonest to do so."  By contrast, "those leaders whose testimony did not support [Petitioner's] application gave very weak arguments to support their opinion."  Exhibit A at 5.

49.     In conclusion, the Investigating Officer recommended that Petitioner's CO application be approved.

**After various procedural steps, Petitioner's CO application is submitted
to the Department of the Army Conscientious Objector Review Board for final action.**

50.     After the Investigating Officer's favorable Report and Recommendation, Petitioner's CO Application went through additional procedural steps, including review and recommendation by Petitioner's chain of command.

51.     Petitioner's Unit Commander recommended approval of Petitioner's CO application, stating: "After reviewing the [Investigating Officer's] findings and recommendations, reviewing [Petitioner's] rebuttal, and speaking with [Petitioner], I believe he is in earnest.  He displays integrity and sincerity.  I have no reason to doubt his claim or beliefs

as a C.O."  Petitioner's previous Unit Commander had also recommended approval of Petitioner's application.

52.     However, Petitioner's Battalion Commander twice recommended denying Petitioner's CO application, citing as reasons that Petitioner was well educated, that he had sought duty as a USMC Officer and a Ranger, that the reasons for his decision were implausible, and that there was no reason he could not serve as a medic.

53.     The Battalion Commander did not meet with Petitioner prior to making his adverse recommendations, and none of his stated reasons would constitute a legally sufficient basis in fact for denial of Petitioner's CO application.

54.     Petitioner's Brigade Commander also recommended denying Petitioner's CO application, citing as reasons that he "cannot understand how an intelligent individual like this studies Pacifism for 7-8 years and then tries joining the Marines and then Army.  He knew what this organization is about and perhaps regrets his decision to stay because he has 3 years of service remaining."  The Brigade Commander's cited reasons were materially wrong: Petitioner had not studied Pacifism for 7-8 years; he attended a Mennonite university for his first year of college and, while there, opposed the Mennonite pacifist philosophy.

55.     The Brigade Commander did not meet with Petitioner prior to making his adverse recommendation and the reasons for his recommendation would not constitute a legally sufficient basis in fact for denial of Petitioner's CO application.

56.     On August 8, 2014, as directed, Petitioner submitted a chronology of his CO case to explain the delay in processing his CO application.  As Petitioner's memo explains, the delay was not in any respect Petitioner's fault, but rather was entirely the fault of Petitioner's chain of

command.  As of August 8, 2014, Petitioner's CO application had been pending for 177 days; applicable regulations call for processing and submission to the DACORB within 90 days.

57.     On August 18, 2014, the Staff Judge Advocate (SJA) issued a memorandum confirming that Petitioner's case record was legally sufficient in law and fact.  The SJA recommended disapproval, but, noting that the Investigating Officer, the Chaplain, and the Company Commander all recommended approving Petitioner's application, observed that "there was room for disagreement."

58.     The Staff Judge Advocate's memo acknowledged that DACORB was the final authority on Petitioner's CO application: "pursuant to AR 600-43, para.2-8. The DACORB … will make the final determination on all applicants requesting discharge (1-0)."

59.     On August 20, 2014, the Division Chaplain issued a memorandum to the Division Commander recommending disapproval of Petitioner's CO application, on the grounds that Petitioner did not have time to "internalize and maturate his new belief system" and that Petitioner, an Atheist, was "angry at God."  The Division Chaplain referred to Petitioner's "Green to Gold" denial and also questioned why his claimed beliefs barred his service as a medic.

60.     The Division Chaplain's memorandum was contrary to applicable regulation, because he did not meet with Petitioner to discuss his beliefs, because he included a recommendation with regard to approval or disapproval of the applicant's CO application, and because he relied on improper factors and criteria.

61.     The Division Chaplain's memorandum, while in violation of applicable law and regulation, appears, on information and belief, to have been influential.  On September 8, 2014, Petitioner's Division Commander, who was the General Court Martial Convening Authority

(GCMCA), recommended that DACORB disapprove Petitioner's CO application, on the grounds that Petitioner "can continue his service obligation as a health care provider" and that Petitioner only raised his CO concerns after he failed at Marine Corps OCS and airborne school, and after his application for "Green to Gold" was denied.

62.     The GCMCA did not meet with Petitioner to discuss his beliefs, and the grounds for his recommendation were factually erroneous and would not constitute a legally sufficient basis in fact for denial of Petitioner's CO application.

63.     On information and belief, the GCMCA's adverse recommendation may also have been influenced by Petitioner's lawful protests concerning delays in the processing of his CO application.   The GCMCA was required to submit a memorandum explaining the delay; as Petitioner explained in his Rebuttal, the GCMCA memorandum inaccurately blamed Petitioner for actions that were in fact the responsibility of his command.  On September 5, 2014, just days before the GCMCA's adverse recommendation, Petitioner made a Request for Redress pursuant to UCMJ Article 138, directed to the GCMCA, seeking movement on his CO application, which at that point had been pending for 205 days. By email on that same date, Petitioner's JAG counsel also complained to the Division Inspector General with regard to this delay.

64.     On September 14, 2014, Petitioner submitted material in rebuttal to the negative reports, comments, and recommendations in the record, in accordance with applicable law and regulation.

65.     Thereafter, Petitioner's CO Packet was complete, and, in accordance with applicable law and regulation, was submitted to the Department of the Army Conscientious Objector Review Board (DACORB) for final action.

**The Department of the Army Conscientious Objector Review Board determines that Petitioner is a Conscientious Objector entitled to an Honorable Discharge.**

66.     By memorandum dated December 16, 2014 ("the DACORB Determination"), DACORB issued its determination that Petitioner's CO application met the burden of proof for obtaining CO status.

67.     The DACORB Determination first presented its Analyst's Discussion and conclusions, which drew favorable attention to the positive recommendations of the unit commanders, and the Investigating officer; Petitioner's clear statements of his beliefs, and the crystallization of his beliefs; and the chaplain's several interviews with Petitioner, including his opinion that Petitioner's CO beliefs were sincere.

68.     The Analyst's Discussion confirmed that the August 20, 2014, Division Chaplain's memorandum "contain[ed] a recommendation [that] is prohibited by [applicable regulation] [and] … the Board should not consider it as evidence in the applicant's request." Exhibit B at 9.

69.     The Analyst's Discussion also gave weight to the Investigating Officer's findings and conclusions.

70.     The Analyst's Discussion concluded that after carefully reviewing all the evidence in Petitioner's packet, "he has clearly shown that he is conscientiously opposed to participation in war in any form as he believes he must live peacefully and nonviolently based on his moral and ethical beliefs, and that his CO belief is firm, fixed and deeply held."  Exhibit B at 9.

71.     In reaching this conclusion, the Analyst's Discussion concluded that the chaplain, the Investigating Officer and the unit commander were all able to discern Petitioner's sincerity, notwithstanding the brief period of the development and crystallization of his CO beliefs, and the timing of his application coinciding with the denial of his Green to Gold application.

72.     The Analyst's Discussion acknowledged the testimony of witnesses attesting to changes in Petitioner's demeanor, showing that "his moral and ethical convictions have directed his life and are now the primary controlling force in his life."  Those witnesses confirmed that "he spends his time meditating and studying the teachings of peace advocates who promote nonviolence and a world without war."  Exhibit B at 10.

73.     The Analyst's Discussion concluded that Petitioner's "asserted convictions are sincerely held by the impartial observation of his thinking and living in totality, past and present, and the outward manifestation of his asserted beliefs."  Exhibit B at 10.

74.     The Analyst's Discussion concluded that the Petitioner's CO Application, and the Investigating Officer and Chaplain reports, "capture and substantiate in a similar and consistent fashion the underlying basis of [Petitioner's] conscientious objection that supports the award of CO (1-O) status.  It found it "clear and believable" that Petitioner was "sincere in his [CO] convictions and beliefs."  It found that Petitioner had demonstrated that "because of his firm and fixed beliefs, he found himself with no inner peace and struggles with the conflict between his deeply held beliefs and military service."  Exhibit B at 10.

75.     The Analyst's Discussion concluded that Petitioner "presented compelling evidence that clearly and convincingly shows" that his CO claim meets applicable legal and regulatory criteria, "and that his beliefs are sincere."  Accordingly, the Analyst recommended that the DACORB grant Petitioner CO status.  Exhibit B at 10.

76.     DACORB accepted the Analyst's recommendation.  By a majority vote, DACORB determined that "clear and convincing evidence" established the basis of Petitioner's claim, and that Petitioner's CO beliefs were sincere.  The DACORB determined that the overall merits of the case warranted Petitioner's classification as a CO (1-0).  Exhibit B at 10.

### A Deputy Assistant Secretary of the Army countermands the DACORB Determination, in violation of applicable law and regulation.

77.     Pursuant to applicable law and regulation, the DACORB Determination was final and conclusive: "the DACORB will make the final determination on applications on all applications requesting discharge (1-0) ..." Army Regulation  600-43, ¶2-8, "Decision Authority," *available at* http://armypubs.army.mil/epubs/pdf/r600_43.pdf.

78.     After DACORB made its final determination in favor of Petitioner's CO application on December 16, 2014, Petitioner was kept waiting for another two months.

79.     By letter dated January 23, 2015 to DACORB, Petitioner (through his legal representative) sought information about the status of his CO claim.  Petitioner's legal representative had been "told that his claim was reviewed by the board several weeks ago" and was "waiting on a signature."  Petitioner's legal representative sought an expedited final signature and release of the board decision, noting Petitioner's "deep depression, both due to his issues of conscience and also due to the uncertainty of not knowing what is going to happen next."

80.     Petitioner still did not hear from the DACORB, and, by letter dated February 5, 2015, again wrote to the DACORB (through his legal counsel), noting that he had made "repeated calls" seeking release of the decision; and noting Petitioner's "severe stress and mental fatigue."

81.     By memorandum issued on February 19, 2015, the Deputy Assistant Secretary of the Army (Review Boards) claimed authority to override the DACORB Determination, and contrary to the DACORB Determination, unlawfully denied Petitioner's CO application. (Exhibit C)

82.     The Deputy Assistant Secretary stated no reasons for overriding the carefully-reasoned DACORB Determination.

83.     The Deputy Assistant Secretary identified no proper legal or regulatory authority for overriding the finality of the DACORB decision.

84.     The Deputy Assistant Secretary unlawfully denied Petitioner's CO application without a sufficient reason, and in particular without any legally sufficient basis in fact, as well as without proper legal authority.

85.     Since the denial of his CO application, Petitioner has continued to demonstrate that he is sincere in his beliefs and actions as a conscientious objector.  Petitioner has maintained a practice of reading, study, meditation and reflection on pacifist and peace writers and activists. Petitioner is in communication with peace activists including Veterans for Peace, and talks with many veterans support groups.  Petitioner signed a nonviolence pledge, and is a promoter of the "pace e bene" nonviolence movement, www.paceebene.org.  To the extent permitted by his active duty military status, Petitioner speaks out about his beliefs in opposition to participation in war.  Petitioner has been steadfast in his pursuit of seeking recognition as a conscientious objector status, even after being turned down by the Department of the Army.

86.     Petitioner has not trained with or employed a weapon since he submitted his CO application, even after receiving the Deputy Secretary's unauthorized denial of his CO application.

**Petitioner is suffering irreparable harm.**

87.     Petitioner submitted his CO application on February 11, 2014, but was not assigned to duty that minimized conflict with his CO beliefs, as required by applicable Army regulation, until April 21, 2014.

19

88.     Petitioner no longer enjoys the protection of the Army regulation requiring his assignment to duty that minimizes his conflict with his CO beliefs, because the Army has made a final decision denying his CO application.

89.     Because of the denial of Petitioner's CO application, Petitioner will continue to be assigned to duty that conflicts with his beliefs.  If ordered to engage in duty that would conflict with his beliefs, Petitioner would have to refuse and would thereupon be subject to court martial and severe punishment.  His conscientious objection to participation in war would not be a cognizable defense in such a court martial.

90.     If Petitioner is required to continue to serve in the United States Army, he will have to choose between participating in the military and following the deeply-held beliefs that guide his life, and he is likely to be subjected to trial by court-martial and to punishment for adhering to his sincere and legally-protected scruples.

91.     In addition, Petitioner is suffering ongoing irreparable emotional harm, from the denial of his CO application, and from his continuing military service.

92.     This is manifesting in physical symptoms such as insomnia, fatigue, talking in his sleep and other sleep disturbances, chest pain and shortness of breath, and chronic prostatitis.  It is also manifesting in psychological symptoms such as depressed mood, feelings of worthlessness and guilt, diminished ability to think and concentrate, hopelessness, and anxiety.

93.     Petitioner's physical and psychological symptoms are caused by the conflict he experiences daily between his beliefs and his military service; his symptoms worsened when he learned that the Army countermanded the DACORB's favorable determination on his application.

**Petitioner has exhausted his administrative remedies
and has no adequate remedy at law.**

94.     The Deputy Assistant Secretary of the Army's unlawful reversal of
DACORB's favorable determination on Petitioner's conscientious objector application is a
final agency decision.  Petitioner has no further avenues of appeal within the Army.
Petitioner has exhausted his administrative remedies.

95.     Petitioner has no plain, adequate, or complete remedy at law to redress the
wrongs described herein.  Petitioner has been, is being, and will be irreparably injured by
the conduct of the Respondent unless the Court issues a writ of habeas corpus.

## CLAIMS FOR RELIEF

### I.
**Habeas Corpus:  Violation of Army Regulation 600-43
(Unlawful Reversal of DACORB Final Determination)**

96.     Army Regulation 600-43 ¶ 2-8 grants the Department of the Army Conscientious
Objector Review Board (DACORB) the authority to make the final determination on Petitioner's
CO application.

97.     The DACORB made a final determination on Petitioner's CO application, and
properly determined, in accordance with applicable regulations, that Petitioner qualified for CO
status, having established by clear and convincing evidence that he is conscientiously opposed to
war in any form, based on his sincere and deeply held moral and ethical beliefs.  Petitioner thus
established his right to honorable discharge from the Army.

98.  In countermanding DACORB's final determination granting Petitioner CO status, the
Respondent acted unlawfully, without legal authority to deny Petitioner discharge as a
Conscientious Objector.

**II.**
**Habeas Corpus: Violation of Army Regulation 600-43**
**(Unlawful Denial of Conscientious Objector Status)**

99.     Army Regulation 600-43 ¶1-5 grants conscientious objector status to personnel who are conscientiously opposed to war in any form, whose opposition is founded on "religious training and belief" (as defined), and whose position is sincere and deeply held.  The Regulation further provides that such persons are entitled to honorable discharge from the Army.

100.    Petitioner qualifies for conscientious objector status; he proved by clear and convincing evidence, as established by the DACORB Determination, that he is conscientiously opposed to participating in war in any form, based on his sincere and deeply held moral and ethical beliefs.  Respondent has no legally sufficient reason or basis in fact to deny Petitioner honorable discharge as a Conscientious Objector.

**III.**
**Administrative Procedure Act: 5 U.S.C. § 701 *et seq.***

101.    The Department of the Army is an Agency within the meaning of 5 U.S.C. § 701 *et seq.*

102.    Petitioner is a person suffering a wrong because of the Respondent's action, and is entitled to judicial review thereof.

103.    The Respondent's denial of Petitioner's CO application is a final action, subject to judicial review in accordance with 5 U.S.C. § 704.

104.    In countermanding DACORB's determination approving Petitioner's CO application, the Respondent's action was unlawful, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

22

## IV.
## Mandamus:  28 U.S.C. § 1361

105.     Once DACORB approved Petitioner's application for discharge as a

Conscientious Objector, the Respondent had a non-discretionary duty under the governing

regulation to award Petitioner an honorable discharge.


## V.
## Religious Freedom Restoration Act: 42 U.S.C. §2000bb *et seq.*

106.     The facts stated above demonstrate that the Respondent has substantially

burdened Petitioner's exercise of his religion in a manner that is not the least restrictive means of

furthering a compelling governmental interest, in violation of the Religious Freedom Restoration

Act.


## VI.
## Fifth Amendment: Denial of Equal Protection

107.     The facts stated above demonstrate that the Respondent has violated Petitioner's

right to the equal protection of the laws, by holding Petitioner to a different and more stringent

legal standard than other CO applicants in violation of the Fifth Amendment to the United States

Constitution.  On information and belief, the Respondent unlawfully deemed insincere

Petitioner's atheist pacifist beliefs, as compared to COs with more traditional religious pacifist

beliefs.  The Respondent thus unlawfully failed to consider Petitioner's CO application based on

Petitioner's own personal religious beliefs, and unlawfully concluded that Petitioner's CO beliefs

were not irreconcilable with continued service in the Armed Forces.

## RELIEF REQUESTED

WHEREFORE, Petitioner requests that this Court:

a.        Issue an Order pursuant to 28 U.S.C. §2243(¶2), directing the Respondent to show cause before this Court within 20 days why a Writ of Habeas Corpus should not be issued.

b.        Immediately direct the Respondent during the pendency of this petition either to place the Petitioner on leave, or at least to maintain him at an assignment that provides the least possible conflict with his conscientious objector beliefs.

c.        Pursuant to 5 U.S.C. § 706(2), hold unlawful and set aside the Respondent's action unlawfully countermanding the final decision of the DACORB, and reinstate the lawful final decision of the DACORB.

d.        Pursuant to 28 U.S.C. § 1361, issue an order in the nature of a writ of mandamus directing the Respondent to discharge Petitioner honorably as a Conscientious Objector, in accordance with the lawful final decision of the DACORB.

e.        Pursuant to 42 U.S.C. §2000bb *et seq.,* enjoin Respondent from continuing to substantially burden Petitioner's exercise of his religion in a manner that is not the least restrictive means of furthering a compelling governmental interest, and direct the Respondent to discharge Petitioner honorably as a Conscientious Objector.

f.        After full consideration of the merits, issue the writ of habeas corpus, requiring Petitioner's release from the Respondent's custody in the United States Army with an honorable discharge as a Conscientious Objector.

g.        Award Petitioner reasonable attorneys' fees and costs, in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the Civil Rights Attorney's Fees Act, 42 U.S.C. §1988, and any other applicable law.

h.      Order such other and further relief as this Court may deem just and proper.

Dated:  April 29, 2015

Respectfully submitted,
ROBERT AARON WEILBACHER

By his attorneys:

/s/Deborah H. Karpatin_____
Deborah H. Karpatkin
99 Park Avenue, Suite 2600
New York, New York 10016
(646) 865-9930
Fax (212)277-5880
deborah.karpatkin@karpatkinlaw.com


/s/ Arthur B. Spitzer_____
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, DC 20008
(202) 457-0800
Fax (202) 457-0805
artspitzer@aclu-nca.org


/s/Peter Goldberger_____
Peter Goldberger  (PA Bar No. 22364)
50 Rittenhouse Place
Ardmore, PA 19003
(610) 649-8200
peter.goldberger@verizon.net


Counsel for Petitioner

25

## VERIFICATION

I, ROBERT AARON WEILBACHER, pursuant to 28 U.S.C. §§ 1746 and 2242, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing and the following is true and correct:

1.     I am the Petitioner in the foregoing Petition for a Writ of Habeas Corpus and for Other Relief.

2.     I have read the foregoing Petition and know the contents thereof. The Petition is true and correct of my own knowledge, except as to matters stated to be alleged on information and belief, and as to those matters I believe them to be true. Executed on April 27th, 2015 at Columbus, Ohio.

_____
ROBERT AARON WEILBACHER